[Civ. No. 11513.   First Dist., Div. One.   Aug. 7, 1941.]

FLORENCE MUSKIN, Appellant, v. TOM GERUN et al.,
Respondents.

I. B. Padway and John R. Golden for Appellant.

Hoge, Pelton & Gunther and A. Dal Thomson for Respondents.

KNIGHT, J.—Plaintiff, a professional acrobatic dancer, while performing her act at a café owned and operated by defendants, became impaled on a large splinter on the floor; and she brought this action to recover damages for the injuries so received, which she alleged were sustained as a result of defendants' negligence. Defendants denied the allegations of negligence, and as special defense pleaded contributory negligence. A jury returned a verdict in defendants' favor; and from the judgment so entered, plaintiff appeals.

The principal facts may be stated as follows: Plaintiff was a member of a professional acrobatic dancing team consisting of herself and two other young women. For some time they had been putting on their performance in cafés and theatres in various cities; and plaintiff had been taking part in this same act for about six years in many of the larger cities in the United States and in London. The defendants owned and operated the Bal Tabarin café in San Francisco, and hired plaintiff and her partners as independent contractors, at a salary of $400 a week, to give two floor shows each night at Bal Tabarin. Before the first floor show was put on and during the intermission between the two shows the portion of the floor on which the team was required to perform was used for dancing by the patrons of the café. Their engagement at Bal Tabarin started on May 24, 1939, and continued up to the night of the accident, on June 9, 1939. They wore thin, ankle length dresses; and as part of the act plaintiff ran across the floor, and when about a yard from the band stand took a leap and slid across the floor on her stomach. On the night of the accident, in performing this usual routine, she took the leap and started to slide, but "stopped dead." She did not

know what had happened, but she could not get up and was in great pain. She called the orchestra leader over; and it was discovered that she was impaled to the floor by a large splinter, which remained attached to the floor at its base and impaled her by entering her leg just below the groin and emerging below the knee. Some of the employees of the café tried to release her from the floor by using a chisel to pry up the boards, but were unable to remove her; and she remained pinned to the floor some twenty or thirty minutes before she was finally taken off by an ambulance crew, and conveyed to the emergency hospital, where the splinter was removed. It was about seventeen inches long, two and a half inches wide and an inch thick at the base, and tapered off to a point. It had entered her leg about three inches below the groin, and emerged about four inches below the upper border of the knee cap. She was transferred to the St. Francis Hospital under the care of the personal physician of one of the defendants, where she remained for about six days. She was then taken to an apartment, and later returned to Los Angeles. At the time of trial she had done some work, including some dancing in a chorus in Los Angeles, but was unable to take part again in the acrobatic dancing performance she had been putting on when injured. The trial took place about nine months after the accident, and at that time there were several scars on her leg where the splinter entered and came out, and another scar where a hypodermic needle had been used to draw off fluid; she complained of numbness around the knee; and it was also shown that at the time of trial she still had a small splinter under the skin, which the medical testimony showed could be removed by a simple operation.

The floor on which the accident occurred was constructed of hard maple, tongue and groove boards 2½ inches wide and 13/16ths inches thick, nailed to a wooden floor. After the accident the part of the floor which had been chopped up to remove plaintiff was repaired, and several other boards were replaced; and later the arrangement was changed so that a raised platform was placed over part of the floor, and a new floor laid over the platform. The testimony shows that at the time the accident occurred there were small cracks in the floor, which one witness said was due to driving nails into the top surface of the boards, and one of the defendants testified that he found about eleven nails which had been so placed in the tops of the boards. Under stipulation the jury visited

the café to view the floor as reconstructed. One of the defendants had witnessed the performance in Los Angeles and elsewhere before he engaged the team to perform at Bal Tabarin.

Plaintiff testified that she and the other girls looked the floor over when they rehearsed before opening their engagement at the Bal Tabarin, and also at that time asked the defendant Tom Gerun, by whom they had been employed, if he could have someone go over the floor with a felt pad to clean the floor, as they wore white ''sharkskin'' (a synthetic silk) evening dresses and would like to have the floor kept as clean as possible; that Gerun said he would take care of everything—see that everything was ''fine'' for them to work with. Gerun denied that anything was said to him by plaintiff or other members of the act about keeping the floor clean; but it appears from the record that about five o'clock every evening the floor was swept by bus-boys, to see if there was any gum on it. If there was, it was scraped off and the floor polished with steel wool, and then mopped up with a damp mop; and once a week the floor was polished by hand with wax. But as stated, between the first and second floor shows the public used the floor for dancing, and before the second floor show began defendants neither inspected nor cleaned the floor.

The grounds of appeal relate to the matter of the instructions. In this regard plaintiff complains that she was not accorded an impartial trial for several reasons, among them being that the trial court's charge to the jury upon the doctrine of contributory negligence was grossly unfair in that the instructions given on that subject were overwhelmingly in favor of defendants, and besides were over emphasized by reading most of them to the jury three times. An examination of the record shows that there is much force in the criticisms offered by plaintiff in this behalf. It is true that nearly all of the instructions given on that subject were general in character, and that an analysis of them fails to disclose any specific statement of law which can be said to be contrary to the established rules governing said doctrine. But as plaintiff points out, almost all of the instructions so given were proposed by defendants, and while she submitted a number of instructions upon that subject also, which in terms applied more particularly to the facts of the present case, and some of

which embodied principles of law not covered by the court's charge, most of them were refused. And with respect to plaintiff's complaint that the court's charge relating to contributory negligence was over emphasized, the record shows the following: During the deliberations of the jury it returned to the courtroom and requested that "the latter part of the instructions" be read again. The court inquired what particular subject the instructions covered the jury desired to have re-read, and the foreman replied, "We would like to ascertain just what constitutes guilt on both sides," and stated that he referred to the instructions "on the long sheet, not the ones in the book." Thereupon the court read to the jury several of the instructions theretofore given including some on the subject of contributory negligence; and after this was done there was further discussion between the court and the foreman of the jury as to whether or not the instructions just read were the ones to which the foreman referred. The court then stated that all of the instructions on the "long sheet" would be re-read, and this was done. Four of the five instructions which were repeated twice, and two of the four repeated once, had to do with contributory negligence. The basis of plaintiff's complaint is that although contributory negligence was made an issue in the case, the evidence wholly failed to establish that fact, and that therefore the effect of giving a lengthy set of instructions on that subject favorable to defendants, and then re-reading most of them to the jury a second and third time, diverted the attention of the jury from the real issue in the case, and prejudicially affected the rights of plaintiff. We are not warranted in holding, as plaintiff seems to contend, that the giving of said instructions and re-reading them to the jury, standing alone, constitutes ground for reversal, because it does not appear that said instructions embodied incorrect statements of law, and it is doubtless within the province of a trial court, when so requested by a jury, to re-read any portion of the charge already given, or to go even further and give additional instructions to clarify those already given.

However, the facts show and the jury was instructed that plaintiff was an invitee on the premises, and we are convinced that the jury was not only inadequately but erroneously instructed as to her rights as such. In this connection the record shows that plaintiff offered a series of instructions on the duty owed by an invitor to an invitee. These were re-

fused by the trial court on the ground that they had been covered by other instructions. The trial court did give three invitee instructions, but all three were negative instructions. They properly informed the jury that an invitor is not an insurer; that he is not liable for obvious defects; that he is not bound to exercise the highest degree of care; that he is not required to keep his premises absolutely safe; that he is not bound to discover defects which reasonable inspection would not disclose; and that by hiring plaintiff defendants did not guarantee that plaintiff would not be injured. Included in these negative instructions also were statements to the effect that "It is his duty to exercise ordinary care to keep his premises in a reasonably safe condition." But no instruction was given to the effect that in determining whether the defendant exercised reasonable care the nature of the particular employment should be considered. That was the very heart of plaintiff's case. The plaintiff offered several instructions on this general subject, none of which was given. The following offered instruction is typical: "I instruct you that if you find from the evidence that the defendants were the owners or occupants of the premises upon which the accident happened and that the plaintiff was dancing thereon at the invitation, express or implied, of said defendants, then it was the duty of the defendants to use reasonable care to keep the premises in a reasonably safe condition *for the necessary and reasonable use of the premises by the plaintiff in connection with her work*, and such failure on the part of the defendants, if you so find, would constitute negligence." (Italics ours.) No instruction was given that covered this basic theory of the plaintiff. To instruct the jury that the defendants were bound to exercise "reasonable care," without telling them that in determining whether the defendants exercised such "reasonable care" they should consider the nature of the employment, was in our opinion error of a most serious nature. Obviously, what would constitute reasonable care in the case of a patron, who is also an invitee and who was using the dance floor for normal dance purposes, would not be the same as the reasonable care owed plaintiff, who was employed by defendants to use the floor for an unusual purpose. This point was not covered in the negative general instructions to which reference has been made. When this error is considered with the charge as a whole, with its over

emphasis on contributory negligence, it is clear that this error was prejudicial.

■■ In support of the verdict defendants contend that in any event the evidence would have been insufficient as a matter of law to uphold a verdict in plaintiff's favor had such a verdict been rendered, and that therefore any error committed in the giving of the instructions becomes immaterial. This contention is based upon the doctrine of assumption of risk, and upon the premise that the evidence wholly fails to establish any negligence on the part of defendants. We are unable to agree with defendants on either of these points. As to the first, it will suffice to say that while a person assumes the perils which are naturally incident to the position he has taken, he does not assume dangers which come only from the negligent act of another (19 Cal. Jur. 589). And as to the second point, it was clearly a question of fact for the jury to determine whether under all the circumstances of the case defendants exercised reasonable care to maintain the premises in a reasonably safe condition for plaintiff to render the particular service she was hired to perform.

■ In view of the conclusion we have reached that the cause must be remanded for a new trial, it should be stated that the case in our opinion is not one in which the doctrine of *res ipsa loquitur* may be properly applied, and that therefore the trial court was justified in refusing to give the instructions proposed by plaintiff on that subject. It should also be stated that other instructions were refused which could properly have been given, and some of those given are subject to criticism. But we do not deem it necessary to elaborate upon them for the reason that grounds for reversal have already been shown.

The judgment is reversed.

Peters, P. J., and Ward, J., concurred.

A petition for a rehearing was denied September 6, 1941. Ward, J., voted for a rehearing. Respondent's petition for a hearing by the Supreme Court was denied October 2, 1941.